UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-CV-10428-RGS

CAROL SURPRENANT, Individually and
on Behalf of All Others Similarly Situated,

v.

MASSACHUSETTS TURNPIKE AUTHORITY
and MASSACHUSETTS PORT AUTHORITY

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS

March 4, 2010

STEARNS, D.J.

In this putative class action lawsuit, plaintiff Carol Surprenant, a Rhode Island resident, seeks a declaration that certain bridge and tunnel tolls assessed by the Massachusetts Turnpike Authority (MTA) and the Massachusetts Port Authority (MassPort) violate her rights, and the rights of others similarly situated, under the dormant Commerce Clause, Article I, § 8, cl. 3, and the Privileges and Immunities Clause, Article IV, § 2, cl. 1, of the United States Constitution.[1] The toll structure implemented by the MTA and MassPort offers concessionary discounts to residents of communities adjacent to the Tobin Bridge, the Sumner Tunnel, and the Ted Williams Tunnel. Surprenant alleges that these discounts unconstitutionally discriminate against nonresident interstate travelers. Defendants now move to dismiss Surprenant's Complaint, arguing that "[a] non-commercial toll – on a local bridge [or tunnel], far from state lines – that does not seek to protect local

---

[1] In her Opposition Memorandum, Surprenant states that she is no longer "pursuing [an] Equal Protection claim." Opp'n at 2 n.3.

commercial interests, does not implicate the dormant Commerce Clause." MassPort Mem. at 2.  Additionally, as the owner-operator of the Tobin Bridge, MassPort contends that it is a "market participant" and therefore immune from Commerce Clause liability. Defendants finally maintain that the constitutional "right to travel" guaranteed by the Privileges and Immunities Clause of Article IV of the United States Constitution does not guarantee a right to discounted tunnel and bridge tolls.  Defendants rely heavily on a decision of the Massachusetts Superior Court, Kelen v. Massachusetts Turnpike Auth., 2007 WL 1418510 (Mass. Super. May 3, 2007) (van Gestel, J.), that "squarely decided" plaintiffs' constitutional claims in favor of the MTA and MassPort.[2]

## BACKGROUND

Surprenant lives in Washington County, Rhode Island.  She drives occasionally to Maine for "tourism" and to other New England states "for business."  She is required to pay the regular bridge and tunnel tolls when traveling through Massachusetts en route to Maine and other northern New England destinations or when traveling from Logan Airport. Compl. ¶ 6. Surprenant states that "in the course of these . . . interstate travels, she . . . purchased a variety of goods and services, including food, fuel, clothing, lift tickets, airline tickets, hotel rooms, books and newspapers."[3]  Id.  On the other hand, Massachusetts residents who live next to the Tobin Bridge or the Ted Williams or Sumner Tunnels pay discounted tolls.  Surprenant describes her lawsuit as follows:

---

[2]Defendants' argument is one of comity, not res judicata, given a vigorously asserted lack of privity between Surprenant and the Kelen plaintiffs.

[3]Surprenant does not specify where these goods and services were purchased.

2

> [a]t issue in this litigation is the constitutionality of a discriminatory toll pricing structure that defendants have in effect at certain locations in the Commonwealth of Massachusetts. Under this structure, substantially discounted toll rates are made available to residents of certain areas of Massachusetts, but not to residents of other states, or residents of other areas of the Commonwealth. These discriminatory pricing policies are effectuated through the Massachusetts Turnpike Authority's Annual FAST LANE Tunnel Communities Resident Program and the Massachusetts Port Authority's Tobin Bridge Resident Permit Discount Program.

Compl. ¶ 1.

The MTA is a "body politic and corporate" organized pursuant to Chapter 81A of the General Laws.[4] The MTA is authorized by statute to operate and maintain the Massachusetts Turnpike. The MTA also operates the Sumner and Ted Williams Tunnels, which provide access to Logan Airport. Each of these MTA facilities charges transit tolls. The revenue generated by tolls is the MTA's principal source of operating income.

MassPort is also constituted as a public authority. See Mass. Gen. Laws ch. 91 App. §§ 1-2. See also Opinion of the Justices, 334 Mass. 721, 731-733 (1956); 740 C.M.R. 11.02. MassPort owns and operates the Tobin Bridge. The Tobin Bridge spans the Mystic River between Chelsea and Charlestown. The Mystic River is also transversed by the Alford Street Bridge and by bridges on Routes 38/28 and Route 16. All but the Tobin Bridge are toll-free. Like the MTA, MassPort is required by law to collect tolls to generate revenues to pay its operating expenses and to service its bond obligations. See Mass. Gen. Laws ch. 91 App. §§ 1-14.

The MTA implemented its Tunnel Communities Resident Discount Program in 1995,

---

[4] The MTA was dissolved on November 1, 2009, and its functions absorbed by the reconstituted Massachusetts Department of Transportation.

pursuant to a statutory mandate. Residents of East Boston, South Boston, and the North End, as well as residents of Chelsea and Charlestown, receive discounted tolls when using the Sumner and Ted Williams Tunnels. See Mass. Gen. Laws ch. 6C, § 13; 730 C.M.R. 7.03(8). The tolls paid by members of the resident discount program are fixed permanently at the rate charged in August of 1995.[5]

On January 1, 1996, MassPort implemented the Tobin Bridge Resident Permit Discount Program for residents of Chelsea and Charlestown.[6] See 740 C.M.R. 11.04. Those eligible to participate are required to join the MTA's Fast Lane Program. Members of the Fast Lane Program are issued transponders for their vehicles. The transponder electronically records the vehicle's passage and bills the toll to the member's credit card. Fast Lane monitors are installed along the Massachusetts Turnpike and at the entrances to the Sumner and Ted Williams Tunnels and the Tobin Bridge. The Fast Lane Program enrolls Massachusetts and out-of-state drivers on equal footing.

## DISCUSSION

To survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and

---

[5] The regular toll at each of the Tunnels is presently $3.50 (there is no discount for Fast Lane members). Discount eligible residents pay $0.40.

[6] The standard Tobin Bridge toll for non-commercial vehicles is (at present) $3.00. See 740 C.M.R. 11.03. Fast Lane Program participants pay a toll of $2.50. Id. Chelsea and Charlestown residents enrolled in the Tobin Bridge Resident Discount Program pay $0.30. Id.

conclusions, and a formulaic recitation of the elements of a cause of action will not do."

Id. at 555 (internal citations omitted).  See also Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95-96 (1st Cir. 2007).

> Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]" – that the pleader is entitled to relief.

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) (internal citations omitted).  See also Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997) (dismissal for failure to state a claim is appropriate if the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.").

MassPort concedes that the discounted Tobin Bridge toll offered to qualifying residents gives preferential treatment to citizens of Chelsea and Charlestown over nonresidents "in-state or out." MassPort Reply at 2. MassPort argues, however, that this "differential treatment" does not violate the dormant Commerce Clause because Surprenant "cannot plausibly show how her payment of a $2.50 non-commercial toll to cross a purely intrastate bridge far from any state border, where nearby toll-free options exist, implicates interstate commerce." Id.  The MTA echoes this argument.

For her part, Surprenant contends that the resident discount programs "impermissibly distinguish on their face between resident and non-resident travelers," and that under a dormant Commerce Clause strict scrutiny analysis, the discriminatory

treatment of nonresidents does not advance "a legitimate local purpose . . . that cannot be adequately served by reasonable nondiscriminatory alternatives." Opp'n at 4-5, citing Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 101 (1994). She further maintains that defendants have "violated her rights under the Privileges and Immunities Clause by penalizing her exercise of the fundamental constitutional right to travel while, she was, among other things, pursuing her livelihood." Opp'n at 17. The arguments raised by Surprenant were addressed at length by Judge van Gestel in Kelen, a class action brought against the MTA and MassPort by two plaintiffs (one a Massachusetts resident, the other a resident of New York) objecting to the same toll discounts at issue here. In summarizing the Kelen plaintiffs' dormant Commerce Clause claim, Judge van Gestel observed that

> [a] state law or policy violates the dormant commerce clause if it "clearly discriminates against interstate commerce in favor of intrastate commerce" or "if it imposes a burden on interstate commerce incommensurate with the local benefits secured." Grand River Enters. Six Nations. Ltd. v. Pryor, 425 F.3d 158, 168 (2d Cir. 2005). The dormant commerce clause is designed to "prevent economic protectionism and retaliation between states and to allow markets to flourish across state borders, thus prohibiting 'laws that would excite . . . jealousies and retaliatory measures between the states.'" Ben Oehrleins & Sons & Daughters, Inc. v. Hennepin County, 115 F.3d 1372, 1382 (8th Cir. 1997), quoting C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 390 (1994). See also Opinion of Justices to the House of Representatives, 428 Mass. 1201, 1204 (1998) (noting an "alertness to the evils of 'economic isolation' and protectionism," quoting Philadelphia v. New Jersey, 437 U.S. 617, 623 (1978)).

Kelen, 2007 WL 1418510, at *6.

A claim brought under the dormant Commerce Clause requires that a court first ask whether a State's policy discriminates against interstate commerce. If it does, the State

6

faces a very imposing hurdle, one that it can master only by showing that "the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." Selevan v. New York Thruway Auth., 584 F.3d 82, 94 (2d Cir. 2009), quoting Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004). As to the first element of the test, a state policy is discriminatory if it "impose[s] commercial barriers or discriminate[s] against an article of commerce by reason of its origin or destination out of state." C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 390 (1994). In rejecting the dormant Commerce Clause claim in Kelen, Judge van Gestel noted that

> [h]ere, Kelen and Pachus fail to allege that the toll program has any impact at all on interstate commerce. The toll gates are not situated around the borders of Massachusetts, but instead are located in central locations in and around Boston. These tolls do not prevent any person access to the Commonwealth. Any burden on interstate commerce here is negligible, if it exists at all. . . . Furthermore, the alleged harm is "not in any way demonstrative of 'economic protectionism,' and unlikely to lead to 'jealousies and retaliatory measures between states.'" [Selevan v. New York Thruway Auth., 470 F. Supp. 2d 158,] 170-171 [(N.D.N.Y. 2007)], quoting Ben Oehrleins & Sons & Daughters, Inc., 115 F.3d at 1382. Plaintiffs fail to identify "any in-state commercial interest that is favored, directly or indirectly, by the challenged toll program at the expense of out-of-state competing interests." Id. at 172. Therefore, the tolls do not have sufficient facial effect on interstate commerce to evoke commerce clause scrutiny.

Kelen, 2007 WL 1418510, at *7.

Judge van Gestel then turned to the second part of the test.[7]

---

[7]The Second Circuit in Selevan, 584 F.3d at 102, concluded that strict scrutiny did not necessarily apply in a case involving very similar facts. In Selevan, nonresident plaintiffs objected to a New York Thruway Authority (NYTA) policy that gave a deep discount to island residents using the Grand Island Bridges. The Court rejected an automatic application of strict scrutiny, as "plaintiffs have failed to 'identify an . . . in-state commercial interest that is favored,' and they do not point to a particular 'out-of-state competitor' that is harmed by NYTA's toll policy." Id. at 95, quoting Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 169 (2d Cir. 2005).

7

> If a state toll does not discriminate against out-of-state economic interests on its face, then the next step is to weigh the toll's burden on interstate commerce against its putative local benefits. Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).  The United States Supreme Court has said that "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Id.  The effects of the toll program here are minimal and incidental at best on interstate commerce. Kelen and Pachus have no way to show that the toll program prevents or hinders entry into or out of the Commonwealth.  Furthermore, there are alternative means of accessing the City of Boston without traveling on the toll roads.  Moreover, the toll program is not clearly excessive in relation to the local benefits of less environmental impact and traffic congestion.  The toll program passes the Pike balancing test.

Id. at *8.

In Doran v. Massachusetts Turnpike Auth., 348 F.3d 315 (1st Cir. 2003), a case relied upon by both Judge van Gestel and the Second Circuit in Selevan, plaintiffs – one a Vermont resident who was not a Fast Lane Program member, the other a New York resident who subscribed to E-Z Pass – alleged that the Fast Lane Program violated the dormant Commerce Clause.[8]  The Doran plaintiffs made four arguments in support of this claim: "1) that the [Program] impose[d] a nonuniform and noncompensatory user fee unrelated to actual highway usage [by requiring nonresident drivers to acquire a $27.50 transponder in order to access the discounted tolls]; 2) that it [was] discriminatory on its face or in practical effect; 3) that it [did] not serve a legitimate local interest unrelated to economic protectionism; and 4) that its cumulative effects on commerce, by shifting highway costs to nonresidents, [were] excessive." Id. at 318.  Affirming the district court's

---

[8]E-Z Pass is a New Jersey-based electronic toll collection system in which a number of states in the Northeast participate.  Fast Lane and E-Z Pass are electronically integrated and extend reciprocal privileges to each other's members.

8

dismissal of the case, the First Circuit noted that the Fast Lane discount was available to residents and nonresidents alike on a non-discriminatory basis, and concluded that the greater incentive on the part of frequent travelers to participate in the program was of no significance. Id. at 319-320.

> [The] MTA "treat[s] [in-state and out-of-state] vehicles with an even hand." Tolls are the same for both kinds of vehicles and each is eligible to participate in the discount program. That the incentive to participate varies across drivers does not make the program discriminatory. That incentive "affects local and out-of-state vehicles in precisely the same way, and thus does not implicate the Commerce Clause."

Id. at 320, quoting Am. Trucking Ass'ns, Inc. v. Scheiner, 483 U.S. 266, 282, 283 n.15 (1987).

> There is nothing to show that one who drives from New York to Boston and pays the $1.00 toll pays a "disproportionate share of the state's highway costs" compared to the suburban commuter who, driving over a much shorter distance on the state's highways, pays the discounted toll of $.75. Thus, the program does not implicate the balancing test under Pike v. Bruce Church, 397 U.S. 137 (1970). Even if it did, however, the plan passes muster. Under the Pike balancing test, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Id. at 142. Here, the effect on nonresident drivers – just as on resident drivers – is that to qualify for the discounts, they must invest $27.50 to acquire a transponder and maintain an account balance of $10-$20. That burden is de minimis in relation to the public benefits of achieving a more equitable sharing of toll burdens among commuters, some of whom pay no tolls on their routes, and facilitating the implementation of an essential funding scheme for major highway improvements.

Id. at 322.[9]

---

[9]MassPort also argues that Surprenant's dormant Commerce Clause claim is barred by the "market participant" doctrine. This doctrine "differentiates between a State's acting in its distinctive governmental capacity, and a State's acting in the more general capacity of a market participant; only the former is subject to the limitations of the [dormant]

In response to the logic and weight of the <u>Kelen</u> decision (and <u>Doran</u>), Surprenant argues that Judge van Gestel simply got it wrong when he applied the <u>Pike</u> test rather than the test of <u>Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.</u>, 405 U.S. 707

---

Commerce Clause." <u>New Energy Co. of Ind. v. Limbach</u>, 486 U.S. 269, 277 (1988).  <u>See</u> <u>Reeves v. Stake</u>, 447 U.S. 429, 438 (1980) (state as cement manufacturer and seller); <u>Hughes v. Alexandria Scrap Corp.</u>, 426 U.S. 794, 806-810 (1976) (state as scrap metal purchaser).  The thrust of MassPort's argument is effectively parried in <u>Selevan</u>.  There, while acknowledging the case-by-case nature of the various rulings on the doctrine, the Second Circuit noted a clear distinction that is created when a body politic and corporate exercises the sovereign regulatory and taxing power of the State in carrying out a delegated governmental function.

> [A] court reviewing a claim that the dormant Commerce Clause has been violated must consider in each specific context if the government is acting like a private business or a government entity.  NYTA contends that "[i]n setting toll rates to raise revenue to maintain its property and satisfy its bondholders, [NYTA] is not regulating commerce, but is acting in a proprietary capacity as a market participant in the local highway transportation market."  However, the statute creating NYTA provides that NYTA "*shall be regarded as performing a governmental function* in carrying out its corporate purpose and in exercising the powers granted by this title." N.Y. Pub. Auth. § 353 (emphasis added).  There is good reason for this designation and for our repeated observation that building and maintaining roads is a core governmental function.  Although there is undoubtedly a market comprised of private entities competing with one another for government contracts, we see no evidence in the record that NYTA competes with other entities that are also seeking to build and maintain highway systems.

<u>Selevan</u>, 584 F.3d at 93 (internal citations omitted).  As Surprenant points out, like the NYTA, both the MTA and MassPort operate under statutes that define their respective missions as essential governmental functions.  <u>See</u> Mass. Gen. Laws ch. 81A, § 1.  <u>See also</u> <u>Posner v. Minsky</u>, 353 Mass. 656, 662 (1968).  MassPort's additional argument that Congress has expressly exempted the Tunnel Communities Resident Discount Program from Commerce Clause scrutiny is simply mistaken.  MassPort relies on a statute, 33 U.S.C. § 508, under which Congress transferred the authority to regulate certain bridge tolls from the Secretary of Transportation to the various states.  The argument fails on the simple fact that the Tobin Bridge was never under federal regulation and was therefore unaffected by the enactment of the statute.

(1972), a Supreme Court case discussing the constitutionality (in general) of state tolls imposed on interstate commerce. Evansville provides that such a toll will "pass constitutional muster" (only) if: (1) the fee does not discriminate against interstate commerce; (2) the fee reflects "a fair, if imperfect, approximation" of the value of the benefit conferred; and (3) the fee is not excessive in relation to the costs incurred by the taxing authority. Id. at 717-719.[10]

As Surprenant views the test, once a facial case of discrimination is made out, the burden shifts to the MTA and MassPort

> to show, under the "strictest scrutiny," that the challenged law "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." Oregon Waste, 511 U.S. at 101. Although the validity of any proffered justification would inevitably be fact based and subject to discovery, plaintiff has nevertheless alleged that the defendants will be unable to meet their burden because even assuming, *arguendo*, there is a valid local purpose – and there is none – there exist many reasonable nondiscriminatory means. For example, the defendants could eliminate the resident based discount and, instead, as many states have done, offer volume discounts to all travelers, regardless of residency. While the cost to residents may well rise because frequent non-resident travelers would no longer be subsidizing their transportation costs, such a pricing structure would be non-discriminatory. See Doran v. Massachusetts Turnpike Auth., 348 F.3d 315, 319, 321 (1st Cir. 2003) (upholding frequent discount plan because "the frequency calculus creates no resident versus nonresident classification" and "interstate travelers pay the same tolls as resident travelers."). It would also eliminate many of the perceived ills that residents allegedly suffer as a result of their proximity to the Bridge and Tunnels by encouraging the use of mass transit.

Opp'n at 6.

The Second Circuit in Selevan relied on essentially the same argument. In

---

[10] The Second Circuit uses the shorthand term "Northwest Airlines test," styled after Northwest Airlines, Inc. v. County of Kent, Mich., 510 U.S. 355 (1994), a later case discussing Evansville.

11

Selevan, plaintiffs challenged an NYTA toll policy that requires nonresidents of Grand Island, New York, to pay a toll of 75 cents to cross the Grand Island Bridges, while Island residents pay as little as 9 cents. The Second Circuit vacated the district court's order dismissing plaintiffs' case and remanded their dormant Commerce Clause and Privileges and Immunities Clause claims for further consideration. While the Second Circuit agreed with the district court that the differential toll policy might well be warranted, the Court faulted the district court for relying on the "prudential standing" doctrine as its principal reason for dismissing the case. Selevan, 584 F.3d at 91. The mistaken application of the doctrine, while it did not necessarily invalidate the district court's reasoning that plaintiffs' claims had failed to adequately allege discrimination against interstate commerce, nonetheless led the district court to end its analysis on the standing issue without considering the three-part Northwest Airlines test. In this respect, I believe that the Second Circuit was wrong in mandating the application of the Northwest Airlines test, and that the Pike test applied by Judge van Gestel is the correct one under the facts and circumstances of Kelen and, by extension, those of this case.[11]

Privileges and Immunities Clause

In dismissing plaintiffs' Privileges and Immunities Clause claim in Kelen, Judge van

---

[11] I do not agree with the Second Circuit's suggestion that Northwest Airlines refines the Pike test. While the two tests are not inconsistent, they are alternate tests, not substitutes for one another. The First Circuit recognized the distinction in Doran in considering the two tests in the alternative. See 348 F.3d at 320, 321, 322. The Northwest Airlines test is applied when reviewing the constitutionality of a tax or penalty imposed directly on interstate commerce. The Pike test, on the other hand, is the test to be applied when a concessionary benefit that incidentally impacts interstate commerce is granted to in-state residents.

Gestel held that

> [t]here is no fundamental right violated by the toll program. The toll program's burden on interstate travel is minimal and it does not involve a fundamental interest. Kelen and Pachus fail to allege how the discounted toll fees place an unlawful burden on their right to enter and leave the state. Even with all reasonable inferences drawn in their favor, they will still be unable to prove that the toll program bears "upon the vitality of the Nation as a single entity" and that there is a fundamental right being violated treating both resident and nonresidents differently.

Kelen, 2007 WL 1418510, at *5, quoting Baldwin v. Fish & Game Comm'n, 436 U.S. 371, 383, 394 (1978). In this regard, Judge van Gestel was relying on the body of Supreme Court jurisprudence acknowledged in Selevan holding that minor restrictions on travel do not amount to the denial of a fundamental right.[12]

Surprenant's claim is based on the premise that she has in fact suffered a violation of her "fundamental" right to travel. Opp'n at 17. The protections of the Privileges and Immunities Clause apply (as Surprenant acknowledges) only to the most fundamental of rights. See Baldwin, 436 U.S. at 387; Cote-Whitacre v. Dep't of Pub. Health, 446 Mass. 350, 380 (2006).

That the right to travel is fundamental is not the issue. The issue rather, as Judge van Gestel correctly framed it, is whether Surprenant's right to travel is in fact inhibited in any meaningful sense. Whether a burden placed by a State on a nonresident is unreasonable under the Privileges and Immunities Clause depends on whether the challenged classification "strike[s] at the heart of an interest deemed so 'fundamental' that

---

[12]See Selevan, 584 F.3d at 101. Beyond this observation, Selevan offers little for present purposes on the right to travel as its discussion is framed almost wholly in terms of the Fourteenth Amendment's Privileges *or* Immunities Clause rather than Article IV's Privileges *and* Immunities Clause. Surprenant's claim is based on Article IV only.

13

its derogation would 'hinder the formation, the purpose, or the development of a single Union of [the] States.'" Kelen, 2007 WL 1418510, at *4, quoting Baldwin, 436 U.S. at 383, 387. To constitute a penalty compromising the right to travel, a toll differential must have a "significant effect" on interstate travel. Lee v. Comm'r of Revenue, 395 Mass. 527, 530 (1985). Here the lack of a discount does not impede or prevent Surprenant from using the Tobin Bridge or the Tunnels. It simply requires her to pay the same rate as almost all other travelers, including the overwhelming majority of Massachusetts residents. Surprenant is free to travel on any of the alternative non-toll highways, roads, and bridges that are available to her and to residents of Massachusetts (as Surprenant concedes she has done on occasion in the past). In sum, the impact of the resident discount program on Surprenant's (or any other potential plaintiff's) right to travel is de minimis at best.

Conclusion

While Surprenant's Privileges and Immunities Clause claim fails to sufficiently plead a violation of a fundamental right, on this record the court cannot say that she has failed to plead a violation of the dormant Commerce Clause. Under the Pike test, defendants must show not only that the tolls charged Surprenant are based on some fair approximation of the cost of her use of the facilities, but also that any burden imposed is not clearly excessive in relation to the *local* benefits conferred by the preferred resident discounts. These benefits are summarized by MassPort as follows.

> Plaintiffs here cannot dispute Judge van Gestel's finding that the resident discount is closely tied to Massport's substantial interest in offering a measure of mitigation to residents of the communities that host the Bridge. Kelen, 2007 WL 1418510 at *5. It is self-evident that these residents face increased air, noise, and other environmental pollution, traffic congestion,

and more. See, e.g., Kaigler Decl. Exh. A (maps showing, e.g., Bridge exit onto Beacon Street in Chelsea). Courts have found these to be compelling, not to mention substantial, concerns. See, e.g., Westchester Day School v. Village of Mamaroneck, 386 F.3d 183[, 191] (2d. Cir. 2004) (traffic concerns can be compelling interest); Weil v. McClough, 618 F. Supp. 1294, 1296 (S.D.N.Y. 1985) (addressing noise pollution is a compelling interest); Lutz v. City of York, 899 F.2d 255[, 269] (3d Cir. 1990) (assuming that addressing pollution is compelling interest); Slaven v. BP America, Inc., 786 F. Supp. 853, 863 (C.D. Cal. 1992) (strong local interest in addressing pollution); see also Commonwealth v. Petralia, 372 Mass. 452[, 456] (1977) (reducing traffic and pollution is a legitimate interest). Courts have acknowledged these very effects from overhead bridges and roads. See Soling v. New York State, 804 F. Supp. 532, 535 n.5 (S.D.N.Y. 1992) (taking judicial notice that Connecticut eliminated tolls on major highways because of public complaints of delays, pollution, and other disadvantages of highway tolls).[13]

MassPort Mem. at 16.

These considerations may all be apt. But without further factual development, their mere recitation is an insufficient basis on which to allow a Rule 12(b)(6) motion to dismiss.

## ORDER

For the foregoing reasons, defendants' motion to dismiss is ALLOWED as to the Privileges and Immunities Clause claim and DENIED as to the dormant Commerce Clause

---

[13]The same arguments were made to Judge van Gestel, although they appear to have been better documented. He summarized the defendants' showing as follows.

> [T]he MTA and Massport suggest that their reasons for the disparate treatment include mitigating an adverse impact on the roadway's host communities because they face increased air, noise, and other environmental pollution, traffic congestion, vibration from the use of the bridge and tunnels by large vehicles, extra vehicles exiting onto city streets and because the host community residents use the bridge and tunnels more than others. As stated in [County Bd. of Arlington County, Virginia v. Richards, 434 U.S. 5, 7 (1977)], granting a slight travel privilege to the communities most affected by the tunnels and the bridge closely relates to the objectives the defendants are attempting to achieve.

Kelen, 2007 WL 1418510, at *5.

15

claim.[14] The court will authorize a 90-day period for discovery, followed by supplemental briefing, all limited to the Pike issues identified by the court in this opinion. Plaintiff will file the amendment(s) to her damages claims within thirty (30) days of the date of this Order. Discovery will close on June 7, 2010. Defendants will file their supplemental briefs by June 21, 2010, and Surprenant will file her response by July 6, 2010.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE

---

[14]The court agrees with defendants that Surprenant's damages claims are deficient by reason of her failure to plead a violation of the Federal Civil Rights Act, 42 U.S.C. § 1983. As the omission, however, is one of pleading error, the court will allow Surprenant leave to file a curative amendment. See Torres Ramirez v. Bermudez Garcia, 898 F.2d 224, 226-227 (1st Cir. 1990). The additional arguments made by defendants against the damages claim are better addressed in the court's consideration of the parties' subsequent pleadings.