UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 09-CV-10428-RGS

CAROL SURPRENANT, Individually and
on Behalf of All Others Similarly Situated

v.

THE MASSACHUSETTS DEPARTMENT OF TRANSPORTATION

MEMORANDUM AND ORDER ON MOTION TO
ALTER OR AMEND JUDGMENT AND FOR
LEAVE TO FILE A SECOND AMENDED COMPLAINT'

May 9, 2011

STEARNS, D.J.

On February 4, 2011, the court allowed the Massachusetts Department of Transportation's (MassDOT) motion for judgment on the pleadings.[1] The court held that as a recently constituted arm of the Commonwealth, MassDOT is immune from suit under the Eleventh Amendment. Judgment entered for MassDOT on February 7, 2011. On March 7, 2011, Surprenant filed a motion to alter or amend the judgment under Rule 59(e), and for leave to file a Second Amended Complaint.

---

[1] In her original Complaint, plaintiff Carol Surprenant, a Rhode Island resident, alleged that certain concessionary bridge and tunnel tolls granted by the Massachusetts Turnpike Authority (MTA) and the Massachusetts Port Authority (MassPort) to local residents discriminate against out-of-state travelers in violation of the Dormant Commerce Clause. MassDOT, the successor to the MTA and MassPort, moved for dismissal pursuant to Fed. R. Civ. P. 12(c).

Surprenant argues that leave to amend her Complaint should be granted because: (1) in her Opposition to MassDOT's motion for judgment on the pleadings, she made clear her intention to seek leave to name the Secretary of MassDOT as a defendant in the event her argument against the motion failed; (2) the prayer in the First Amended Complaint for a declaration that the Resident Discount Program violates the Dormant Commerce Clause constituted a curative claim for "prospective declaratory relief";[2] (3) the court's factual and legal conclusions in its February 4, 2011 Memorandum and Order were erroneous; and finally, (4) because granting leave to amend would cause "absolutely no prejudice . . . to defendants." MassDOT counters that: (1) Surprenant delayed seeking leave to amend more for than thirteen months after it made clear that it intended to invoke sovereign immunity; (2) Surprenant has failed to make the extraordinary showing of entitlement to relief that a Rule 59(e) motion requires;[3] and

---

[2] As the court previously noted, "an award of prospective declaratory relief that has much the same effect as a full-fledged award of damages or restitution by the federal court, is the kind of relief prohibited by the Eleventh Amendment." Mem. and Order of Feb. 4, 2011 (Dkt. # 94), at 10 n.10, quoting *Mills v. State of Maine*, 118 F.3d 37, 54-55 (1st Cir. 1997). *See also Regents of the Univ. Of California v. Doe*, 519 U.S. 425, 429 (1997). *Compare Green v. Mansour*, 474 U.S. 64, 68 (1985).

[3] In the First Circuit, "Rule 59(e) motions are granted only where the movant shows a manifest error of law or newly discovered evidence." *Prescott v. Higgins*, 538 F.3d 32, 45 (1st Cir. 2008). "A Rule 59(e) motion should not . . . raise arguments which could, and should, have been made before judgment issued." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 55 (1st Cir. 2008), quoting *Harley-Davidson Motor Co. v. Bank of New England*, 897 F.2d 611, 616 (1st Cir. 1990).

(3) the proposed amendment in any event is futile "as it contains no factual allegations plausibly suggesting that the resident discount toll programs challenged by Surprenant violate the Dormant Commerce Clause." MassDOT Opp'n at 1. I agree on all three points, but will focus on the third and first argument.

As the court stated in footnote 12 of its February 7, 2011 Memorandum and Order,

> [b]ecause sovereign immunity operates as a complete bar to further litigation, any comment on the *Pike* test issues that were the subject of discovery before the immunity defense was raised would be superfluous dicta. Suffice it to say, there is nothing cited in Surprenant's brief that would undermine Judge van Gestel's decision in *Kelen v. Massachusetts Tpk. Auth.*, 2007 WL 1418510 (Mass. Super. May 3, 2007), that the resident toll structure program passes constitutional muster.

The parties' post-discovery submissions on the *Pike* issues amply confirm Judge van Gestel's common-sense determination that the burdens faced by local residents who live adjacent to the Sumner and Ted Williams Tunnels and the Tobin Memorial Bridge are substantial and that the benefit conferred by the Resident Discount Program, while it is real, is not excessive when weighed against the incidental burden (if it is a burden at all) placed on transient users of the facilities like Surprenant.

A few examples will suffice. MassDOT has offered Rule 30(b)(6) testimony, reports, transcripts, and eyewitness accounts documenting the burdens imposed on the communities that host the Bridge and the Tunnels. Some of these burdens are

historical, including the splitting of communities and the takings of housing and other property.[4] Others are on-going, such as increased traffic, noise, air pollution, accidents, jack hammering, vibration, the diversion of traffic onto local streets, soil contamination, flooding, and disruptions of utility services and business operations. *See* O'Meara Decl. ¶¶ 7-9; Cote Decl. - Exs. 5 and 6; and Ernst Decl. ¶¶ 5-11.[5]

Stephen Collins, the Director of Statewide Tolling for MassDOT and a Rule30(b)(6) deponent, testified about the impact the construction of the Ted Williams

---

[4] Although Surprenant disagrees with defendant that the statute of limitations precludes class claims for damages accrued prior to March 30, 2006, she contends that the court should ignore any evidence offered by MassDOT that falls outside the statute of limitations. However, the court notes that the Discount Program was implemented to redress historical burdens as well as those that MassDOT indicates as "on-going."

[5] A MassDOT Traffic and Revenue Study, dated January 28, 2010, found that the Tobin Bridge carries volumes "in excess of 80,000 vehicles on an average day, and in 2009 the Ted Williams Tunnel averaged 33,100 westbound and 31,600 eastbound trips daily; the Sumner Tunnel averaged 21,300 daily trips; and the Callahan Tunnel averaged 23,100 daily trips. Small Decl. - Ex. 2 at 24779. With these vehicles comes pollution and noise.

Tunnel and the Big Dig[6] have had (and will continue to have) on the host communities.[7]

According to Collins,

> [t]hese communities were host to the project itself, to the construction. The construction was being done by the Massachusetts Turnpike Authority, and [the Resident Discount Program] is a goodwill gesture towards the community for living with those impacts, both the impacts of facility and for the construction, 24 hours a day, 7 days a week. Not only is it a goodwill gesture, but it provides the community with a financial – it relieves a financial hardship from them because these communities are subject to those tolls to do more than just to commute to and from work every day. They are subject to those tolls to get their kids to soccer games, to get to City Hall for a birth certificate, to get back again, to take trips from their homes that you and I take for granted.

Collins Dep. at 53:21-54:11. Collins also testified to a permanent loss of parking and the seemingly never-ending need to correct recurring problems with the Central Artery Project.

Helmut Ernst, MassDOT's District Highway Director for the District 6 region (also a Rule 30(b)(6) deponent) testified to the impact of regular maintenance work on

---

[6] The Big Dig involved replacing Boston's deteriorating six-lane elevated Central Artery (I-93) with an underground highway connected to the new Leonard P. Zakim Bunker Hill Memorial Bridge and extending to Boston's Logan International Airport and Route 1A. The Big Dig spans over 7.3 miles of highway, 161 lane miles in all, about half of which is below ground. Excavation work on the Central Artery Tunnel Project began in earnest in 1995.

[7] Collins served as chief of toll operations for the MTA from March of 2008 to November 1, 2009; Chief of Staff for the MTA from 2007 to 2008; Associate Project Director for the Central Artery/Tunnel Project from the early 2000s until 2007; and Manager of Community Relations in Mitigation from 1999 until the early 2000s.

local communities.[8] Moreover, much of the work must be done at night to avoid traffic congestion, thus disrupting the sleep of those who live nearby. Ernst Dep. at 17:16-18:21. Ernst also noted that construction of the Ted Williams Tunnel and the Central Artery required the installation of portals in South Boston and East Boston and the erection of buildings in Charlestown, East Boston and South Boston to house the needed ventilation systems.

> The ventilation fans create additional vibrations and noise as well as dust within these communities. Traffic now cuts through South Boston to reach and to travel from the South Boston portal to the Ted Williams Tunnel. Trucks have been diverted through South Boston particularly with the construction of the Haul Road that runs from 1-93 to the mouth of the Ted Williams Tunnel. A continuing issue in each of these communities is the routing of hazardous cargos through their streets often in close proximity to residential areas. There also continue to be problems with air quality. The O'Neill Tunnel and its connecting highways have instances where air emission standards at the south portal are exceeded.

Ernst Decl ¶¶ 8-9.

In sum, Surprenant's claim that "the Non-resident Traveler (or commuter) is . . . being economically burdened while the Resident Traveler (or commuter) is not," Pl. Supplemental Br. at 6, is simply not viable in light of the overwhelming evidence to the

---

[8] An example of recurring maintenance cited by MassDOT is the regularly scheduled repainting of the Tobin Bridge, which generates paint chips, dust, noise, and traffic snarls in the neighboring communities.

contrary.⁹ Surprenant states that she has used the Tobin Bridge or Ted Williams Tunnel "on several occasions." Am. Compl. ¶ 7. On those occasions she has paid $3.00 to cross the Tobin Bridge and $3.50 to use the Williams Tunnel. *Id.* ¶ 34. MassDOT offers concrete examples of local residents who are required to make use of the Bridge or Tunnels several times a day to take children to school, to commute to work, and to keep appointments.

Finally, Surprenant argues that the court should grant her leave to file a Second Amended Complaint because she had noted in her Opposition to MassDOT's motion for judgment on the pleadings her contingent intention to name the Secretary as a defendant if necessary. The same gambit, however, failed in a recent case before the First Circuit Court of Appeals, *Brait Builders Corp. v. Massachusetts*, 2011 WL 1631952 (1st Cir. May 2, 2011). In *Brait*, as here, the Commonwealth raised the Eleventh Amendment bar. Plaintiff Brait responded with a motion to amend its complaint by adding four state officials in their individual and official capacities. Although the district court allowed the motion, Brait neither filed an amended complaint nor made service on the proposed new defendants. Brait, like Surprenant, argued that its giving notice to amend should have

---

⁹ The court notes that if Surprenant elects to pass through the Tobin Bridge or one of the Tunnels, she pays the same toll as any Massachusetts resident other than the small group of local Massachusetts residents who qualify for the Resident Discount Program.

been sufficient and that it would have been "a waste of resources" to file an amended complaint while the district court was considering the motion to dismiss. The Court of Appeals gave short shrift to the argument, noting that Brait had had four months to file an amended complaint and failed to do so. *Id.* at *3-4. Surprenant had thirteen months (and unlike the plaintiff in *Brait* never even filed a motion for leave to amend). Under the circumstances, the result is the same as in *Brait*.[10]

ORDER

Under *Pike* and *Kelen*, all that is required is a demonstration that the burdens on the host communities truly exist and are not illusory, and that any incidental burden placed on out-of-state users like Surprenant are not "clearly excessive." *See* Memorandum and Order of August 23, 2010, at 3. The testimony, declarations, and exhibits submitted by MassDOT easily satisfy this requirement. Accordingly, Surprenant's Motion to Alter or Amend Judgment under Rule 59(e) and Grant Plaintiff Leave to File a Second Amended Complaint is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns

---

[10] As the court noted in its February 4, 2011 Memorandum, the prospective relief Surprenant had sought in her original Complaint was the establishment of a constructive trust guaranteeing an eventual payout should the class prevail on her constitutional claim.

8

_____
UNITED STATES DISTRICT JUDGE